UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.                              CASE NO: 2:09-cr-92-FtM-29CM

GABRIEL EGUEZ
_____

### OPINION AND ORDER

This matter comes before the Court on defendant's Motion to Dismiss the Indictment Based on Violation of Due Process and Sixth Amendment Speedy Trial Rights (Doc. #119)[1] filed on July 31, 2016. The Government's Response (Doc. #125) was filed on August 26, 2016. The Court conducted an evidentiary hearing on October 27, 2016. For the reasons set forth below, the motion is **GRANTED.**

### I.

The testimony at the evidentiary hearing and the record in the case reflect the following factual chronology:

---

[1]While the caption of the motion refers to the Due Process Clause, the motion itself makes no reference to this provision. Therefore, any due process claim has been abandoned.  The motion also relies on Federal Rule of Criminal Procedure 48(b)(3), but dismissal under this Rule is only mandatory if there has been a violation of defendant's constitutional rights.  United States v. Knight, 562 F.3d 1314, 1324 (11th Cir. 2009).

## A. Defendant's Initial Activities in United States

Defendant Gabriel Eguez (defendant or Eguez) was born in Santa Cruz, Bolivia, South America.  Defendant first came to the United States on November 17, 2000 on a Temporary Tourist Visa which was valid through May 2001.  It appears that defendant stayed in the United States beyond the visa limitation period,[2] and in July 2005, defendant and Crystal Kelly had a daughter born in the United States.  On September 21, 2006, defendant and Ms. Kelley were married in the United States.

The next immigration record for defendant was in October 2006. Through counsel, defendant's United States citizen wife filed a petition for lawful permanent resident status in the United States on defendant's behalf.  On January 31, 2007, U.S. immigration officials approved issuance of a conditional Permanent Resident Card ("green card") allowing defendant to stay in the United States as a lawful resident until January 31, 2009.  (Gov't Ex. 2, p. 4.) Defendant obtained a United States Social Security card on April 11, 2007, and a Florida driver's license on December 21, 2007. (Id.)

---

[2] The government's written Response (Doc. #125, pp. 2-3) alleges additional facts about defendant's activities during this time period, but no such facts were presented at the evidentiary hearing.

**B. Defendant's Pre-Indictment International Travel**

Shortly after defendant obtained his legal status in the United States in early 2007, he began to travel internationally. Documents collated by federal agents show that from 2007 through early 2009 defendant (either alone or with his wife or daughter) traveled from the United States to Bolivia twelve times, the Bahamas once, and Mexico once, and traveled at least once from Bolivia to Brazil (Gov't Exs. 10A, 10B):

| Dates of Travel From United States (except last entry) | Destination Country |
|---|---|
| February 15, 2007 through February 27, 2007 | Bolivia |
| May 31, 2007 through June 12, 2007 | Bolivia |
| September 19, 2007 through October 6, 2007 | Bolivia |
| December 27, 2007 through January 6, 2008 | Bolivia |
| January 31, 2008 through February 7, 2008 | Bolivia |
| March 21, 2008 through March 24, 2008 | Nassau, Bahamas |
| May 13, 2008 through June 5, 2008 | Bolivia |
| June 6, 2008 through June 9, 2008 | Cancun, Mexico |
| June 21, 2008 through July 14, 2008 | Bolivia |
| July 18, 2008 through August 4, 2008 | Bolivia |
| August 6, 2008 through September 22, 2008 | Bolivia |
| September 23, 2008 through October 4, 2008 | Bolivia |
| October 5, 2008 through November 28, 2008 | Bolivia |
| December 5, 2008 through January 26, 2009 | Bolivia |

| January 1, 2009 through January 6, 2009 | Brazil (from Bolivia) |
|---|---|

## C. Defendant's Pre-Indictment Contact With Bank

In April 2008, Darlene Hathaway, an investigator for what was then SunTrust Bank, was conducting an internal bank investigation involving a bank employee (Carlos Perez) who was adding names to customers' bank accounts.  Ms. Hathaway testified this type of conduct was being used to help perpetrate mortgage fraud, and she froze various accounts so she could speak with the individual account holders.  Because a George Teague had been added to defendant's account, Ms. Hathaway met with defendant and George Teague and a Mr. Fernandez[3] on April 25, 2008.  Teague explained why his name was added to defendant's account, but the explanation did not make sense to Ms. Hathaway.  Ms. Hathaway told them that this practice was not common and was not something she should be seeing.  Ms. Hathaway did not tell defendant that the practice was illegal, that the authorities would have to be contacted over the events, or that there would be any criminal action in the future.

## D. Defendant Leaves the United States

Ms. Janeth Armendia testified that she and defendant lived together as husband and wife in Bolivia from December 2008 until defendant's arrest in February 2016.  Records obtained by the

---

[3]One of the accounts frozen by Ms. Hathaway belonged to Mr. Fernandez.

government show defendant left the United States and arrived in Bolivia on December 5, 2008.   Defendant's wife and daughter remained in the United States.   Ms. Armendia was not asked to explain why defendant left the United States, and the Court declines to accept the factual representations made in defendant's motion (Doc. #119, p. 2) which are not supported by the evidence presented at the evidentiary hearing.

### E. Defendant's Extended Permanent Resident Alien Status

On January 28, 2009, defendant and his wife filed a petition to remove the conditions from the green card, listing their address at a residence in Cape Coral, Florida.

In March 2009, defendant continued his international travel. Defendant traveled from the United States to Bolivia and to the Dominican Republic.   (Gov't Exs. 10A, 10B.)

The immigration petition was granted on May 21, 2009, defendant's lawful status in the United States was extended through January 31, 2019, and a new "green card" was mailed to defendant in Cape Coral, Florida.   (Gov't Ex. 2, p. 4.)

### F. FBI's Investigation of Underlying Offense

On March 10, 2009, Special Agent Kevin O'Grady, then with the Federal Bureau of Investigation (FBI), began investigating a mortgage fraud case targeting the real estate firm of Professional Realty Consultants and several of its employees, including defendant.   Special Agent O'Grady and other agents began to

interview witnesses on March 26, 2009, and interviewed about a dozen people. Special Agent O'Grady left messages from several employees who had gone to Bolivia, and received return telephone calls from Mr. Mauricio Higa on July 17, 2009, Mr. Juan Pablo Hurtado on July 21, 2009, and Said Cassis on October 2, 2009. Special Agent O'Grady interviewed each telephonically.

Special Agent O'Grady also knocked on the door of defendant's last known address in Cape Coral, Florida and left a business card when no one answered. Special Agent O'Grady later received a telephone call from defendant's wife, Crystal Kelly Eguez. Special Agent O'Grady told her he would like to speak with her husband about an investigation he was conducting, and asked to be put in contact with her husband.

On August 12, 2009, Special O'Grady received a telephone call from defendant, who said he was calling from Bolivia in response to the inquiry made of his wife. Special Agent O'Grady told defendant he was investigating mortgages in regard to purchases of properties in a condo conversion at Venetian Palms, and that defendant's name had come up in the investigation. Special Agent O'Grady asked defendant a series of questions, which defendant answered. Defendant gave the agent several telephone numbers in Bolivia where he could be reached and said he was running a business in Bolivia. Defendant also said he was returning to the United States in October 2009. At the time Special Agent O'Grady

considered defendant a target and subject of his investigation, but did not give that information to defendant.   Other agents interviewed Alfredo Cassis on October 1, 2009, who said defendant was residing in Bolivia.

On September 6, 2009, defendant and his wife were divorced.

### G. Mortgage Fraud Indictment

On October 14, 2009, defendant and seven others were indicted in the Fort Myers Division of the Middle District of Florida.   The Indictment (Doc. #1) alleged that defendants conspired to commit wire fraud and to defraud a financial institution.   Among the "manner and means" paragraphs, it was alleged that three of the co-defendants paid bribes to Carlos Perez so he would add the names of mortgage loan applicants to existing bank accounts, thus making it appear the applicants were more creditworthy than they actually were.   (Id. at 5.)   On the same day, an arrest warrant was issued for defendant.   (Docs. ##2, 96.)

Shortly after the Indictment, Carlos Perez and Alfredo Cassis were arrested in the United States.   Besides Eguez, none of the other defendants have been arrested.

### H. Efforts to Arrest Defendant

Special Agent O'Grady placed defendant's name and date of birth in the National Crime Information Center (NCIC) computer and posted the arrest warrant in the system.[4]   Information in this

---

[4]The government's Response describes in more detail how this

system is accessible by officers in the United States, but not to officials of foreign countries, except for Canada.

Special Agent O'Grady appears to have been satisfied that defendant was residing in Bolivia.  Special Agent O'Grady never made any attempt to inform defendant that he had been indicted. He did not call the telephone numbers in Bolivia given to him by defendant, or check out defendant's business in Bolivia, or return to defendant's wife's house in Cape Coral, or call the American consulate in Bolivia.  Special Agent O'Grady did not cause the issuance of a "Red Notice" by Interpol or seek defendant's extradition from Bolivia.  Special Agent O'Grady testified that his experience was that fugitives who flee internationally often return to the United States if they have connections, particularly family connections, with the United States.  In such cases, entry into the NCIC system alerts officers at border entry points. Special Agent O'Grady testified he knew defendant was married and had a daughter in the United States (but apparently was unaware of defendant's pre-indictment divorce).  Special Agent O'Grady believed defendant would eventually come back to the United States on his own and would be arrested as he crossed the border.

---

was done between October 15 and November 13, 2009.  (Doc. #125, pp. 4-5.)  Information that was not presented at the evidentiary hearing will not be considered.

Defendant's last documented travel from the United States was on March 26, 2009 to Bolivia.   Thereafter defendant traveled between countries in South America and elsewhere for which little or no documentation has been obtained.   Defendant traveled from Bolivia to Argentina in August 2009; to Brazil in December 2010 and in December 2012; to Colombia; to Chile in 2011; and to Panama. Defendant could travel on an identification card when going to Brazil, Argentina, and Chile, but his passport was utilized in Panama and Colombia.

## I. Defendant Returns to United States

San Ysidro, California, south of San Diego, is the most western and the busiest port of entry in the United States.   On February 16, 2016, Victor Quezada was working as a primary inspection officer for the U.S. Customs and Border Protection Office at San Ysidro. At about 4:15 p.m. defendant, driving a white vehicle with Mexican license plates, handed Officer Quezada his United States Permanent Residence Card as he was leaving Mexico and attempting to enter the United States.   Defendant stated he was going to San Diego to visit friends, he had been visiting friends in Mexico, the vehicle was a rental car, and he lived in Florida.   Officer Quezada entered defendant's name and date of birth into the Vehicle Primary Client computer system, and discovered the NCIC alert and that defendant had not crossed the border at that location for at least the prior six months.   Officer Quezada caused defendant to be escorted to

the secondary inspection location, where a number of identification documents were taken from defendant.   All the identification documents were in defendant's true name.   (Gov't Ex. 2.)   Two Bolivian passports were also taken from defendant, one expired and one current.   (Gov't Exs. 3A, 3B.)   The current passport can no longer be found by the government.   Airline tickets in defendant's possession indicated that on February 15, 2016, defendant flew from Nuevo Laredo, Mexico to Tijuana, Mexico.

Defendant was arrested on the arrest warrant issued in this case.   (Doc. #96.)   On March 1, 2016, defendant waived his detention and removal hearings in California and consented to be sent to the Middle District of Florida.   (Doc. #97, p. 17.)   On March 23, 2016, defendant had his initial appearance in the Fort Myers Division of the Middle District of Florida.   (Doc. #100.) On July 31, 2016, defendant, through counsel, asserted his speedy trial right by the filing of the Motion to Dismiss.   (Doc. #119.)

## II.

Defendant asserts that the delay between the filing of the Indictment on October 14, 2009 and his arrest on February 16, 2016 was a violation of his constitutional rights to a speedy trial. The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial . . . ."   U.S. Const. amend. VI.   The Supreme Court has described the speedy-trial right as "amorphous," "slippery," and

"necessarily relative." Vermont v. Brillon, 556 U.S. 81, 89 (2009) (quoting Barker v. Wingo, 407 U.S. 514, 522 (1972)).   Instead of adopting an inflexible approach, the Supreme Court has "established a balancing test, in which the conduct of both the prosecution and the defendant are weighed." Id. at 90 (quoting Barker, 407 U.S. at 529, 530).   Doggett v. United States, 505 U.S. 647 (1992) is the leading case addressing delay in arrest after the return of an indictment, and analyzed such delay utilizing the four Barker factors:   "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." Id. at 651 (citation omitted).   See also United States v. Villarreal, 613 F.3d 1344, 1350 (11th Cir. 2010).

### A. Length of Delay

There is a twofold inquiry as to the length of delay.   First, defendant must show that "the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." Doggett, 505 U.S. at 651-52 (citation omitted).   If defendant makes this showing, the court must then consider the extent to which the "delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." Id. at 652 (citation omitted).

In this case, defendant was indicted on October 14, 2009 and arrested on February 16, 2016. This delay of about 6-1/2 years is sufficient to trigger the speedy trial inquiry. Id. at 652 n.1 (noting that courts have generally found postaccusation delay presumptively prejudicial when it approaches one year). See also United States v. Ingram, 446 F.3d 1332, 1336 (11th Cir. 2006). The delay also extended significantly beyond the minimum necessary to show presumptive prejudice. See Doggett, 505 U.S. at 652 (explaining that "the presumption that pretrial delay has prejudiced the accused intensifies over time"); Villarreal, 613 F.3d at 1350-51. This factor, therefore, weighs heavily against the government, and triggers the Court's review of the other three factors.

**B. Reasons for Delay; Relative Blame for Delay**

The next inquiry examines the reasons for the delay, and evaluates whether the government or the defendant is more to blame for the delay. Doggett, 505 U.S. at 652-53. The burden is on the prosecution to explain the cause of the pre-trial delay. Villarreal, 613 F.3d at 1351 (citation omitted); Ingram, 446 F.3d at 1337 (citation omitted). The Court allocates different weight to different reasons for delay:

> (1) "[a] deliberate attempt to delay the trial in order to hamper the defense [is] weighted heavily against the government"; (2) "[a] more neutral reason such as negligence or overcrowded courts [is] weighted less heavily [against the government] but nevertheless [is] considered since the ultimate responsibility for such

circumstances must rest with the government rather than the defendant"; and (3) "a valid reason, such as a missing witness, . . . serve[s] to justify appropriate delay." A government's inability to arrest or try a defendant because of the defendant's own evasive tactics constitutes a valid reason for delay. But the government's failure to pursue a defendant diligently will weigh against it, more or less heavily depending on if the government acted in good or bad faith.

Villarreal, 613 F.3d at 1351 (alterations in original) (internal citations omitted).

The Court finds that the government has not acted with a deliberate attempt to delay the arrest of defendant or to hinder defendant's defense.  The Court further finds no bad faith on the part of the government, and that the government agents acted in good faith. These findings, however, do not resolve the issue of negligence.  The parties argue extensively over whether there were valid reasons for the delay or whether the delay was due to government negligence.

The Court rejects the government's assertion that defendant left the United States during the investigative stage of the case. Neither party inquired of Ms. Armendia as to defendant's reasons for moving.  While defendant had a conversation at the SunTrust Bank with Ms. Hathaway seven months prior to his departure, the content of the conversation as described by Ms. Hathaway would not lead a reasonable person to believe he was being investigated. Certainly Ms. Hathaway never conveyed such an impression to defendant.  Additionally, the meeting clearly had no such impact

on defendant.   Defendant continued his international travels, leaving the United States and returning on seven different occasions between the April 2008 meeting and his December 2008 departure from the United States.   The federal investigation obviously did not cause defendant to go to Bolivia, since it did not begin until approximately four months after defendant's December 2008 departure.   "Even though [defendant] left the country prior to his indictment, the government still had an obligation to attempt to find him and bring him to trial."   United States v. Mendoza, 530 F.3d 758, 763 (9th Cir. 2008).

The government also argues that it made "reasonable efforts to locate and prosecute defendant" and that the failure to arrest defendant was "due to the defendant's own evasive actions." (Doc. #125, p. 9.)   The evidence does not support these arguments.

First, defendant's location was well known to the government. The case agent had spoken to defendant by telephone pre-indictment, and obtained his contact information in Bolivia.   Other witnesses had told the government that defendant was in Bolivia.   The agents clearly believed defendant was in Bolivia.

Second, the evidence does not convince the Court that the government has established defendant knew he had been indicted. No one from the government told defendant or his family of the indictment, and no one from the government told any foreign country of defendant's indictment.   While fugitive co-defendants were in

Bolivia, there is no evidence that they met with or had any discussions with defendant. The Court is unwilling to infer that simply being in the same part of Bolivia means defendant had been told of the indictment by the fugitive co-defendants. The government points to defendant's pre-indictment statement to Special Agent O'Grady that he intended to return to the United States in October 2009, and defendant's failure to do so. In September 2009, after this conversation with Special Agent O'Grady, defendant and his wife obtained a divorce. The Court is unable to attach the same significance to the change of travel plans as does the government. The records establish that defendant stopped traveling to the United States before his indictment, but after his divorce. Defendant's only known connection with the United States - his young daughter - would thereafter visit him in Bolivia. The Court finds this insufficient to either establish knowledge of the indictment or to constitute evasive action by defendant. See United States v. Brown, 169 F.3d 344, 349-50 (6th Cir. 1999) (finding use of alias did not constitute evidence of defendant's knowledge of indictment).

Third, the record simply does not reflect that defendant took "evasive actions" even if it could be found that he knew he had been indicted. Defendant told Special Agent O'Grady he was residing in Bolivia and had a business there, and gave him several contact numbers. Defendant remained in Bolivia, traveling

extensively but always returning to Bolivia.  Defendant traveled to countries which had a better relationship with the United States than Bolivia, and utilized his own identification and passports. Defendant even went to the American Embassy in Santa Cruz in 2012 in connection with his daughter's passport.

Finally, the Court finds that the government was negligent in failing to take reasonable steps to have defendant arrested. Essentially what the government did was enter defendant's name and date of birth in the NCIC computer and wait for a "hit" on the computer.  Under the circumstances of this case, that was clearly insufficient.

The Ninth Circuit succinctly summarized the pertinent legal principles in Mendoza:

> The government has some obligation to pursue a defendant and bring him to trial.  If the government fulfills that obligation by pursuing a defendant with reasonable diligence, the defendant does not have a speedy trial claim.  On the other hand, if the government is negligent in pursuing the defendant, prejudice is presumed.
>
> . . . If a defendant attempts to avoid detection, the government is not required to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension.  However, if the defendant is not attempting to avoid detection and the government makes no serious effort to find him, the government is considered negligent in its pursuit.

530 F.3d at 762-63 (internal citations omitted).

Here, the government failed to obtain a "Red Notice" through Interpol or make any efforts to extradite defendant from Bolivia.

While neither guaranteed success, it was unreasonable and negligent for the government not to pursue such avenues in this case.

First, the government made no effort to extradite defendant from Bolivia — his known location.  As a general matter, the United States has an obligation to seek extradition of a fugitive defendant unless it has a good faith belief, supported by substantial evidence, that such efforts would be futile.  United States v. Corona-Verbera, 509 F.3d 1105, 1114-16 (9th Cir. 2007); United States v. Pomeroy, 822 F.2d 718, 721-22 (8th Cir. 1987).  The United States and Bolivia have an extradition treaty which includes extradition for offenses with a penalty of more than one year in prison, includes conspiracy offenses, and includes extradition of Bolivian nationals who have committed fraud involving multiple victims.  Treaty Between the Government of the United States and the Government of the Republic of Bolivia on Extradition, Bol.-U.S., arts. I, II, III, June 27, 1995, S. Treaty Doc. No. 104-22.  The government asserts that such an attempt would be futile because the diplomatic relations between the United States and Bolivia were extremely strained.  The Declaration of Magdalena A. Boynton asserts that the United States-Bolivian relationship deteriorated in 2008 when the Bolivian government expelled the U.S. Ambassador and the U.S. Drug Enforcement Administration from Bolivia.  (Gov't Ex. 1, ¶ 8.)  Ms. Boynton reports that in the last decade Bolivia has not extradited any fugitives to the United States based on the

bilateral treaty between the two countries (but does not indicate how many times such extradition has been sought).  (Id. ¶ 10.) Special Agent O'Grady contacted the attaché in Chile about cooperation with Bolivian authorities regarding arresting Bolivian nationals, and was told they would not get cooperation from Bolivia.

The government has not established that extradition from Bolivia would be futile in this case.  The best Ms. Boynton was able to say was:  "Based on this extradition history, I cannot maintain that an extradition request to Bolivia from 2009 through the present would have been addressed and resolved in a timely manner."  (Id.)  While perhaps a difficult process, the government was obligated to at least seek extradition in this case.

Second, the government did not seek a "Red Notice" from Interpol to alert other foreign countries of the United States arrest warrant.  A Red Notice is an Interpol mechanism which posts a notice in countries throughout the world indicating there is an active arrest warrant for someone.  Ms. Boynton described Interpol Notices as "international requests for cooperation or alerts allowing police in member countries to share critical crime-related information" and stated that with Red Notices "the persons concerned are wanted by national jurisdictions for prosecution or to serve a sentence based on an arrest warrant or court decision." (Id. ¶ 9.)

In February 2011, the FBI solicited information from their field offices about fugitives with a potential nexus to South America to be the potential subjects in Operation INFRA-SA (International Fugitive Round-up and Arrest – South America). (Def. Ex. A.)  The FBI was going to participate in the fugitive roundup between March 14, 2011 and June 3, 2011.  (Id. at 1.) Among other requirements was an active Red Notice.  (Id. at 2.) On March 14, 2011, the FBI field office responded by including defendant as one such fugitive.  (Id. at 4.)

In March, 2011, Special Agent O'Grady considered using a Red Notice as to defendant, but decided against it because in his prior experience in three different foreign offices he had found Red Notices to not generally be an efficient way to arrest a fugitive. Various countries have different treaties, political hostility, and reluctance to extradite.  Government emails in March 2011 suggest that extradition from Bolivia was a "non-starter diplomatically" because Bolivian nationals could not be extradited except for crimes that are violations of International Criminal Law, which was doubtful as to mortgage fraud.  (Def. Ex. B.)  The same email, however, recommended the Interpol notices in the event that defendant travels elsewhere.  (Id.)  Pursuing the Red Notice would certainly have increased the government's ability to arrest defendant in a more United States-friendly country than Bolivia.

The government took the most minimal steps possible in this case – it placed defendant in the NCIC computer system and waited. The Sixth Amendment required much more in this case.  This factor weighs heavily against the government.

### C. Defendant's Assertion of Speedy Trial

Defendant invoked his speedy trial right after his arrival in the Middle District of Florida during the normal course of the criminal proceedings.  On July 31, 2016, defendant through counsel asserted his speedy trial right by the filing of the motion to dismiss.  (Doc. #119.)  Given the lack of evidence that defendant knew he had been indicted, the motion was timely and this factor weighs heavily against the government.

### D. Prejudice as Result of Delay

The final factor is the extent to which the defendant suffered actual prejudice from the delay.  In the Eleventh Circuit, if "the first three factors do not weigh heavily against the government, the defendant generally must demonstrate actual prejudice to succeed on his speedy trial claim."  Villarreal, 613 F.3d at 1355 (citation omitted).  See also United States v. Dunn, 345 F.3d 1285, 1296-97 (11th Cir. 2003); United States v. Register, 182 F.3d 820, 827 (11th Cir. 1999).  The Court assesses the prejudice suffered by the defendant in light of the three interests of the defendant that the speedy trial right was intended to protect:  "(1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety

and concern of the accused; and (3) to limit the possibility that the defense will be impaired." Villarreal, 613 F.3d at 1355 (quoting Barker, 407 U.S. at 532); Doggett, 505 U.S. at 654. The "most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Villarreal, 613 F.3d at 1355 (citation omitted).

Here, defendant was not in custody until his February 16, 2016 arrest, so there was no "oppressive pretrial incarceration." Since there was no evidence he knew of the indictment, there could be no resultant "anxiety and concern" about it. The only remaining type of prejudice, and the most important, is an impaired defense "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Doggett, 505 U.S. at 654 (citation omitted). The evidence at the evidentiary hearing did not establish any actual prejudice to defendant from the delay, but counsel proffered potential prejudice in trial strategy and available witnesses.

Barker explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown." 407 U.S. at 532. Doggett stated

> that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other Barker

> criteria, it is part of the mix of relevant facts, and
> its importance increases with the length of delay.

505 U.S. at 655-56 (internal citation omitted); <u>Villarreal</u>, 613 F.3d at 1355-56 (concluding no speedy-trial violation, although nearly 10-year delay from indictment to arrest, which weighed against convicted defendant). Given the length of the delay in this case, the Court finds presumptive prejudice to defendant in the preparation and presentation of his case. This factor weighs heavily against the government.

The Court balances the four factors heavily against the United States. The Court finds the government has deprived defendant of his constitutional right to a speedy trial under the Sixth Amendment.

Accordingly, it is hereby

**ORDERED:**

Defendant's Motion to Dismiss the Indictment Based on Violation of Due Process and Sixth Amendment Speedy Trial Rights (Doc. #119) is **GRANTED.** The Indictment (Doc. #1) against defendant Gabriel Eguez is **DISMISSED WITH PREJUDICE.**

**DONE and ORDERED** at Fort Myers, Florida, this __2nd__ day of November, 2016.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

- 22 -

Copies:
Counsel of Record